# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DARNELL WEBSTER,

    Plaintiff

v.

JOSEPH LOMBARDO, et al.,

    Defendants

Case No.: 3:20-cv-00070-ART-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 75

This Report and Recommendation is made to the Honorable Anne R. Traum, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendant NaphCare, Inc.'s motion for summary judgment. (ECF No. 75.) Plaintiff filed a response. (ECF No. 77.) NaphCare filed a reply. (ECF No. 78.)

After a thorough review, it is recommended that NaphCare's motion be granted and that judgment be entered in its favor.

## I. BACKGROUND

Plaintiff is currently an inmate in the custody of the Nevada Department of Corrections (NDOC), however, the events giving rise to this action took place while he was a pretrial detainee in the custody of the Clark County Detention Center (CCDC) in Las Vegas, Nevada. Plaintiff is proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 4.)

The court screened Plaintiff's complaint and allowed him to proceed with a Fourteenth Amendment claim for inadequate medical care against Doe Medical staff (once he learned of their identity and successfully moved to amend his complaint to substitute in their true name(s)),

as well a claim that the violation of his right to adequate medical care was a product of a policy or custom of NaphCare. (ECF No. 3.)[1]

The claims are based on allegations that on February 25, 2017, Plaintiff's right knee was injured during his arrest. He was taken to CCDC, which has a contract with NaphCare to provide medical services to pretrial detainees. Plaintiff avers that he informed intake officers about his injury, showing them his swollen right knee. He alleges that he did not have a pre-existing injury to his knee.[2] He was then seen by Doe medical staff, and told them about his injury, and the intense pain he was experiencing, and the swelling on his knee was obvious. Doe medical staff provided him only with an ACE bandage wrap and ibuprofen, but did not perform a thorough medical exam or x-rays, and did not offer to draw off any of the fluid to relieve the pressure and pain. Plaintiff goes on to assert that he consistently complained to correctional staff that his knee was getting worse, and while he was taken to see NaphCare Doe medical staff at least three times, they did nothing to address his injury.

On February 8, 2018, he was rushed to University Medical Center (UMC) for emergency surgery, where he was diagnosed with osteomyelitis, an inflammation of the bone due to infection, which resulted in the removal of his knee joint as well as several inches of bone from his lower femur and upper tibia. He was given an artificial knee, and following his surgery he was in extreme pain and in a wheelchair for 12 months. Plaintiff further asserts that once he was remanded to the custody of NDOC, he saw an orthopedic specialist, who noted that Plaintiff's knee is unstable, numb and has some residual pain. Plaintiff claims that NaphCare has a history of complaints about substandard medical care for pretrial detainees.

---

[1] Clark County and Joe Lombardo were dismissed. (*See* ECF Nos. 3, 5.)

[2] This allegation is belied by his medical records.

Plaintiff did not timely and properly move to amend to substitute the true names of the Doe Medical Staff; therefore, they should be dismissed without prejudice. As such, this action is only proceeding against NaphCare.

NaphCare moves for summary judgment, arguing that there is no evidence that it was deliberately indifferent to Plaintiff's medical needs. Instead, NaphCare maintains Plaintiff received regular evaluation and treatment. NaphCare contends that even if the court were to conclude that its providers delayed diagnosis of his infection, such a claim sounds, at most, in negligence, and not deliberate indifference. Finally, NaphCare argues there is no evidence that it had a policy, custom, or practice that was the moving force behind Plaintiff's alleged constitutional violation.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin,* 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.,* 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson,* 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.,* 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett,* 477 U.S. 317, 323-25 (1986).

1    If the moving party satisfies its initial burden, the burden shifts to the opposing party to

2   establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

3   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

4   dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

5   be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

6   *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

7   (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

8   by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

9   U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

10  pleadings and set forth specific facts by producing competent evidence that shows a genuine

11  dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Facts**

14    NaphCare submits Plaintiff's medical records in support of its motion for summary

15  judgment. Plaintiff does not dispute the accuracy of these records or that they demonstrate the

16  treatment he received relative to his right knee beginning in December of 2014.

17    Plaintiff saw Greg T. Caudill, PAC, of Cascade Orthopedics, on December 4, 2014, and

18  relayed a history of progressive bilateral knee pain, bilateral knee arthroscopies, and a septic

19  joint dating back to 1998. He was previously advised that he needed bilateral total knee

20  replacements, but he had to cancel the surgery due to incarceration from 2011 to 2014. He had a

21  recent episode of his right knee giving way descending stairs. X-rays at that time showed

22  significant degenerative changes, and he was assessed with osteoarthritis in both knees. He was

23  given Tramadol, and a consultation was arranged with Dr. Milan Moore. (ECF No. 75 at 53-54.)

Plaintiff saw Dr. Moore on December 8, 2014, who noted that Plaintiff's most recent right knee arthroscopy was in 2001, which was complicated by infection resulting in a septic knee and the development of tricompartmental osteoarthritis. Dr. Moore recommended a right total knee replacement. (*Id*. at 51-52.)

Dr. Moore performed a right knee total arthroplasty on January 13, 2015. (*Id*. at 55-57.) One week out from surgery, Plaintiff had swelling in the lower extremity, and he went to the emergency room where an ultrasound was performed and ruled out deep vein thrombosis (DVT). He was instructed on elevating his lower extremity and using ice, and he was given pain medications and a compression dressing. (*Id*. at 48.) He saw Dr. Moore again approximately one week later and was doing fairly well. The swelling had improved a great deal, but he continued to have significant knee pain, but continued to wear the ACE wrap. There was no evidence of infection. He was instructed to continue range of motion (ROM) and strengthening. His pain medication was refilled. (*Id*. at 47.)

Plaintiff saw Dr. Moore again on February 25, 2015. He did not have a fever, chills or nausea at that time. His x-ray showed normal alignment, no fracture, and there was no complication or evidence of infection. (*Id*. at 46.)

On March 13, 2015, Plaintiff reported to PAC Caudill that he struck the anterior aspect of his right knee on a table and had some swelling and increased pain. He had mild soft tissue swelling and tenderness, some local warmth, and no erythema. He was assessed with a contusion. He was instructed on ice and protected activities. (*Id*. at 45.)

On May 20, 2015, Plaintiff saw Dr. Moore and reported increased pain after a hyperextension injury and swelling. He was seen at the emergency room, and radiographs were unremarkable. He did not have a fever, chills, or nausea. He hoped to return to light duty work

that week. He had moderate ankle swelling and tenderness to palpation. X-rays showed normal alignment, and no fracture. He was assessed with a hyperextension injury, but there was no evidence of complete rupture of the ligament. While his knee was "somewhat sprained and sore," Dr. Moore expected it to settle down over the next couple of months. He was instructed on icing and elevating, and to continue protected weight bearing with the cane. Dr. Moore found it was appropriate to return to light duty work in a job that required mostly sitting. (*Id*. at 42-43.)

On June 10, 2015, Plaintiff reported increased pain in the right knee after a fall. On examination, he had mild anterior knee swelling and moderate tenderness to palpation. X-rays showed no acute fracture, and the alignment of the implants appeared normal. He was assessed with an anterior contusion, but remained stable. He was instructed on icing and elevating and protected weight bearing with the cane. (*Id*. at 40.)

On July 15, 2015, Plaintiff complained of increased pain in his right knee after a fall. His anterior knee pain had improved but not resolved. He had an interim visit to the emergency room for aspiration of prepatellar bursitis/hematoma. There was a band-like sensation across the anterior aspect of the knee. However, his ROM remained excellent, and he had returned to work. On examination, he had mild anterior knee swelling/prepatellar bursitis, and moderate tenderness to palpation. There was no evidence of patellar or tibial fracture, and the issue was resolving. (*Id*. at 39.)

On October 28, 2015, Plaintiff reported increased right knee pain after another fall. He had mild medial knee swelling. An x-ray showed no evidence of fracture, and alignment appeared normal. He was assessed with a medial collateral ligament sprain, but was stable. He was instructed on icing and elevating the knee and to continue protected weight bearing, and he was dispensed a knee brace. (*Id*. at 37.)

On December 10, 2015, he saw PAC Caudill, and continued to have pain in the medial aspect of the knee, and he requested a pain medication refill. There was mild thickening of the joint, but no true effusion. He was given specific rehabilitation instructions to be done every other day followed by ice. (*Id*. at 36.)

On January 13, 2016, he had his one-year follow-up with Dr. Moore, who noted Plaintiff had a number of events that caused him to request pain medications postoperatively. He said that he was working in the kitchen that sometimes has a slippery floor that causes him to fall, he but denied any recent direct trauma to the knee. He continued to have some pain in the medial aspect of the knee. There was no erythema, but mild medial knee swelling. X-ray showed no fracture, and normal alignment. Dr. Moore described him as having a stable right total knee replacement. He was to be seen back in two years for routine radiographs and follow-up. (*Id*. at 34-35.)

On February 24, 2017, Plaintiff was seen at the Henderson Hospital Emergency Department. He complained of right knee pain. He presented with lower extremity and knee pain and swelling. He was sent there by his primary care provider for evaluation of atraumatic right knee pain and swelling. He also had some numbness and tingling of the right leg, worse below the knee and into the foot. He denied fever or chills. He reported a previous knee replacement. (*Id*. at 126.) A doppler ultrasound was negative for DVT. An x-ray showed joint effusion, but was otherwise normal. His labs were largely unremarkable. He was placed in a knee immobilizer and was given crutches for what appeared to be inflammatory swelling of the knee. He was referred back to orthopedics for an outpatient follow up. (*Id*. at 128.) He was prescribed Naprosyn and hydrocodone-acetaminophen for pain. A work release form was issued indicating he could return to work in March 2017, with no restrictions. (ECF No. 77 at 38-39, 41.) An addendum to the records indicates that Plaintiff was afebrile. (*Id*. 41.)

Plaintiff was arrested the following day, on February 25, 2017, and taken to the Henderson jail. He was subsequently transferred to CCDC, where he was noted as having right knee pain with a history of a total knee replacement. He was wearing an ACE wrap, and his right knee was swollen. He was using ibuprofen, naproxen, and an ice pack. (ECF No. 75 at 120, 210.)

On March 9, 2017, Plaintiff submitted a request stating that his right knee replacement was swollen with fluid and hurt. The response states he was seen on March 7, 2017, and ibuprofen as well as an ACE wrap had been ordered. (*Id*. at 58.)

Plaintiff saw seen on March 17, 2017, for complaints of right knee swelling per the request of Nurse Elizabeth. It was noted he had a total knee replacement, and usually wears a knee brace but it was taken away because it was made of metal. He requested pain medication. He reported that he had been told at the emergency room that the fluid on his knee needed to be drained. He had an ACE wrap ordered. He was limping to favor his right side, and his right knee had a moderate amount of swelling around the bony part of the knee, which was warm to the touch. He was assessed with right knee swelling. A sick call appointment was scheduled with the provider. He was instructed to engage in activity as tolerated, to elevate the knee, take ibuprofen for pain, and use the ACE wrap. (*Id*. at 119-20.)

He was seen by a provider on March 24, 2017. He reported that he went to the emergency room prior to his arrest to assess his swollen knee, and the workup was negative for infection or blood clot. He was given compression therapy and pain medication. He said his knee would swell up intermittently and subside throughout the day. Motrin was not helping with his pain. On examination he had full ROM, no swelling, or effusion. He was assessed with possible reactive arthritis. The plan was to obtain an x-ray of the knee, change to Naprosyn and Zantac, and follow up. (*Id*. at 118-19.)

The radiology report from March 27, 2017, indicated there was no evidence of loosening or fracture of the prosthesis. There was joint effusion, but no other abnormality. (*Id*. at 33.)

On July 22, 2017, he passed the criteria for work clearance at the jail. (*Id*. at 118.)

He was seen on September 7, 2017, for pain and swelling in the right knee. He asked for his knee brace and was told a request would be made, but he was wearing his ACE wrap. The plan was ibuprofen and a warm or cold compress to the area. (*Id*. at 90-95.) He was seen again the next day for pain and swelling of the right knee. The doctor noted that his March 2017, x-ray was unremarkable and he had no new injury to the knee. The right knee was swollen at the midline. There was no warmness. He was assessed with pain and swelling of the right knee. Records were requested from Dr. Moore in Washington. He was to take ibuprofen as needed, and follow-up in a month. (*Id*. at 117.)

Plaintiff saw the doctor again on October 18, 2017. His right knee was bigger than the left, and slightly tender. The request to Dr. Moore was still pending, but Plaintiff was to continue ibuprofen and add Robaxin in the evening, and follow-up in three months. (*Id*. at 83-89.)

Plaintiff saw another doctor on December 8, 2017, and he reported that his swelling seemed to be getting worse lately, but he worked in the kitchen without a problem. On examination, his right knee was swollen on the medial side, but was normal to touch and there was no erythema, but mild to moderate effusion. The doctor ordered a repeat x-ray. Plaintiff was assessed with right knee pain with effusion, status post right knee replacement. The plan was a lower bunk and lower tier for 180 days, a right knee elastic brace during the day (take off at night), an extra blanket to help elevate the lower leg, Naprosyn 500 mg for pain. It was noted he would eventually need an orthopedics referral, and he did not like to be off work and had no problem with his right knee in doing his job. (*Id*. at 116-117.)

A radiology report from December 14, 2017, indicated moderate joint effusion, but no evidence of loosening of the knee prosthesis and no fracture. (*Id*. at 32.)

On December 21, 2017, a doctor reviewed the request for information from Dr. Moore and noted that one year after his knee replacement x-ray showed no acute fracture and normal alignment. (*Id*. at 116.)

On December 27, 2017, Plaintiff requested a cold packet because he had a fever and other symptoms such as coughing and sweating. His temperature was 99.4, and a cold packet was issued. (*Id*. at 56.)

Plaintiff was seen for a follow up regarding his right knee on January 9, 2018. It was noted that the x-ray again showed effusion. He was assessed with right knee pain with effusion, and the plan was to follow up with orthopedics and continue his current treatment. (*Id*. at 115-16.)

Plaintiff saw a doctor about his right knee pain on January 24, 2018. He had some swelling which had worsened, and he had increased pain. Robaxin was added, and a copy of the knee x-ray done the prior month was requested. (*Id*. at 76-82.)

On February 2, 2018, Plaintiff had right knee pain with moderate effusion. It was noted that a referral to a local orthopedist would be made as his previous orthopedist was in Washington. (*Id*. at 115.)

On February 8, 2018, Plaintiff submitted a request that his right knee was excessively swollen. He had a temperature of 96.7, he had right knee swelling, edema +3, redness and the area was warm to the touch. An emergency room evaluation was ordered for suspected cellulitis or DVT. (ECF No. 77 at 53, 57; ECF No. 75 at 114.)

Plaintiff was seen in the UMC emergency department that day. The records from his visit indicate that he had a history of total right knee replacement two years ago, and he complained of right knee swelling that had been present since surgery. However, during the past two weeks, it had become more swollen, painful, red, and hot. He also had swelling of the lower extremity distal to the right knee as well as some erythema, warmth and tenderness to palpation just distal to the knee. He stated that over the past several weeks he noticed night sweats, but denied fever, nausea, or vomiting. He denied trauma to the right knee or a history of blood clots. On examination, he demonstrated erythematous, edematous right knee with some pain with palpation in the popliteal fossa, +1 pitting edema of the right lower extremity distal to the knee. He was afebrile. An x-ray of the right knee showed an intact right knee total arthroplasty, and large knee joint effusion. An ultrasound of the right leg was negative for DVT, but a complex hypoechoic lesion was detected in the right popliteal fossa. Multiple right inguinal lymphadenopathy were also noted. He was assessed with signs and symptoms of a possible hardware infection versus septic arthritis. Further workup was recommended. Basic labs showed certain counts were elevated and concerning for possible hardware infection versus osteomyelitis.

Given the concern for possible joint infection, he was started on vancomycin by IV and orthopedic and infectious disease consultations were ordered. Arthrocentesis was performed which was consistent with a right knee periprosthetic infection and removal of the hardware was recommended.

On February 11, 2018, Plaintiff underwent removal of the infected total knee, incision, and drainage, and placement of an antibiotic spacer block. The infectious disease doctor recommended IV antibiotics for six weeks. Then Plaintiff would have to wait until the antibiotics

1  were completed to obtain a repeat culture on the joint before proceeding with implantation of the

2  new knee replacement.

3      After his hospital stay, he was placed in a rehabilitation program at Summerlin Medical

4  Center and then was discharged back to CCDC around March of 2018. He had the right total

5  knee arthroplasty revision with Dr. Gerald Sylvain at the end of 2018. X-rays from December 7,

6  2018, showed no evidence of loosening, infection, fracture or dislocation or joint effusion or

7  other complication. (ECF No. 75 at 31, 107-113, 132-173.)

8

**B. NaphCare's Experts**

10      In support of its motion, NaphCare submits affidavits from two experts: Dr. James Van

11  den Bogaerde, a board certified orthopedic surgeon, and Dr. David Seidenwurm, who is board

12  certified in diagnostic radiology and neuroradiology. (ECF No. 75 at 181-190.) Plaintiff does not

13  provide any expert opinion in rebuttal.

14      Dr. Van den Bogaerde opines that over the course of 2017 and early 2018, other than

15  swelling and subjective reports of pain, Plaintiff never demonstrated any overt signs of infection

16  in the right knee joint, such as redness, fever, inability to bear weight or the inability to move the

17  knee.

18      As soon as Plaintiff expressed that his chronic right knee symptoms were worsening, and

19  as soon as he exhibited clinical signs supporting the need for further workup, the staff at

20  NaphCare appropriately placed a referral to see an orthopedic surgeon for further evaluation.

21  Getting an appointment would be expected to take at least two to three months, or potentially

22  longer. Dr. Van den Bogaerde opines that any delay in seeing an orthopedist from the time of the

23  referral, was not a delay that can be attributed to NaphCare. In addition, any delay following the

1  determination a referral was needed did not alter Plaintiff's ultimate course of treatment (the

2  two-stage revision that he ultimately received: removal of the infected joint, debridement of the

3  infected area and placement of an antibiotic spacer, followed by revision surgery months later

4  after the infection had cleared). Then, when Plaintiff's right knee symptoms acutely worsened in

5  early February 2018, and he developed classic signs of infection, he was appropriately and

6  immediately transferred to the hospital for further care. It is Dr. Van den Bogaerde's opinion that

7  the care and treatment provided Plaintiff was proper, appropriate, and within the standard of

8  care. (ECF No. 75 at 181-184.)

9      Dr. Seidenwurm reviewed Plaintiff's March 27, 2017 right knee x-rays, and agrees that

10  they showed no evidence of loosening or fracture of the prosthesis, but did show joint effusion.

11  He opines that this x-ray series did not show any specific or diagnostic signs of infection. The

12  prosthesis was stable and properly placed within the bone, with metal flush against the bone, and

13  without any loosening as might be expected in the presence of infection.

14      Dr. Seidenwurm also reviewed Plaintiff's December 14, 2017, right knee x-rays. He

15  agrees with the radiologist's interpretation that there was no evidence of loosening of the knee

16  prosthesis and there was moderate joint effusion. As with the prior x-rays, this x-ray series

17  showed no specific signs of infection.

18      The x-ray report from Plaintiff's February 8, 2018 hospital visit showed large joint

19  effusion and a hypoechoic lesion behind the knee, which is consistent with Plaintiff's condition

20  having worsened. In addition, the inguinal lymphadenopathy noted on the ultrasound would be

21  consistent with an infection in the leg.

22      Dr. Seidenwurm also reviewed x-rays taken after Plaintiff had the infected right knee

23  prosthesis removed. He opines that the bones would have demonstrated signs of evolving

14

osteomyelitis and/or healing, and would have been far more eroded, had Plaintiff been suffering

an infection in the knee joint, an infected prosthesis or active osteomyelitis at the time the x-rays

were taken in March and December 2017. As such, he opines that Plaintiff's knee was likely not

infected with osteomyelitis at the time of the March and December 2017 x-rays.

Finally, he opines that since the March and December 2017 x-rays did not exhibit

specific or diagnostic signs of infection, the standard of care allowed Plaintiff's treating

providers to rely upon these reports in their diagnostic workup and decision-making. (ECF No.

75 at 186-190.)

## C. Analysis

### 1. Fourteenth Amendment Objective Deliberate Indifference

"Individuals in state custody have a constitutional right to adequate medical treatment."

*Sandoval v. County of San Diego,* 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*,

429 U.S. 97, 104-05 (1976)). "For inmates serving custodial sentences following a criminal

conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual

punishment." *Id*. "However, pretrial detainees have not yet been convicted of a crime and

therefore are not subject to punishment by the state. Accordingly, their rights arise under the

Fourteenth Amendment's Due Process Clause." *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 535-36,

n. 16).

Following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)

(pretrial detainee claim of excessive force) and the Ninth Circuit's decision in *Castro v. County*

*of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (pretrial detainee failure to protect claim), the

Ninth Circuit held in *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018), that "claims

for violations of the right to adequate medical care brought by pretrial detainees against

individuals under the Fourteenth Amendment must [also] be evaluated under an objective

deliberate indifference standard[.]" 888 F.3d at 1124-25 (internal quotation marks and citation

omitted). The elements of such a claim are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at a substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.*

"[T]he subjective second prong [that previously applied to these claims] has been

replaced by an objective standard: A defendant can be liable even if he did not actually draw the

inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a

reasonable official in his circumstances would have drawn that inference." *Russell v. Lumitap*, 31

F.4th 729, 739 (9th Cir. 2022).

"[T] 'substantial risk of serious harm' prong [is] met if there was a 'serious medical

need,' such that a 'failure to treat a prisoner's condition could result in further significant injury

or the unnecessary and wanton infliction of pain.'" *Russell*, 31 F.4th at 739 (citation omitted).

"This is an objective standard, and includes the existence of an injury that a reasonable doctor or

patient would find important and worthy of comment or treatment; the presence of a medical

condition that significantly affects an individual's daily activities; or the existence of chronic and

substantial pain." *Id.* (citation and quotation marks omitted).

1    With respect to the third element, the conduct must be "objectively unreasonable, a test

2  that will necessarily turn[ ] on the facts and circumstances of each particular case." *Gordon,* 888

3  F.3d at 1125 (internal quotation marks and citation omitted).

4    "The mere lack of due care by a state official does not deprive an individual of life,

5  liberty or property under the Fourteenth Amendment." *Gordon*, 888 F.3d at 1125 (internal

6  quotation marks and citations omitted). "Thus, the plaintiff must prove more than negligence but

7  less than subjective intent—something akin to reckless disregard." *Id*. (internal quotation marks

8  and citation omitted).

9    "The 'reckless disregard' standard is a formidable one." *Fraihat v. U.S. Immigration and*

10  *Customs Enforcement*, 16 F.4th 613, 636 (9th Cir. 2021) (citing *Roman v. Wolf*, 977 F.3d 935,

11  947 (9th Cir. 2020) (per curiam)). "Neither 'mere lack of due care,' nor 'an inadvertent failure to

12  provide adequate medical care,' nor even '[m]edical malpractice,' without more, is sufficient to

13  meet this standard." *Id*. (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Castro v.*

14  *County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc); *Roman*, 977 F.3d at 947).

15  The plaintiff must show that the defendant disregarded a serious risk to the plaintiff's health "by

16  failing to take 'reasonable and available measures' that could have eliminated that risk." *Id*.

17  (quoting *Castro*, 933 F.3d at 1070-71).

18    The question is whether "a reasonable official, knowing what [the defendant(s)] knew,

19  would have understood that their actions presented such a substantial risk of harm to [the

20  plaintiff] that the failure to act was unconstitutional." *Russell*, 31 F.4th at 740.

21    "[A] prison official who is aware that an inmate is suffering from a serious acute medical

22  condition violates the Constitution when he stands idly by rather than responding with

23  reasonable diligence to treat the condition." *Sandoval*, 985 F.3d at 680.

### 2. Liability of NaphCare under *Monell*

The only remaining defendant is NaphCare, a private company that contracted to provide medical care for pretrial detainees at CCDC. "[T]he requirements of *Monell* [for suits against municipalities] apply to suits against private entities [found to be state actors] under § 1983." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139-40 (9th Cir. 2012). NaphCare does not dispute that it was a state actor when it contracted to provide medical services to CCDC inmates.

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "the Supreme Court held that a municipality may not be held liable for a § 1983 violation under a theory of respondeat superior for the actions of its subordinates." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016). Instead, "municipalities may be held liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive custom or practice; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019) (citation omitted)

The plaintiff must prove: (1) he was deprived of a constitutional right; (2) the municipal defendant had a policy (custom, practice, failure to train, etc., or decision/act of a final policymaker); (3) that amounted to deliberate indifference to the plaintiff's constitutional right; and (4) was the moving force behind the constitutional violation. *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (*Gordon II*).

A "policy is 'a deliberate choice to follow a course of action … by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* (citation and quotation marks omitted). "An unconstitutional policy need not be formal or written to create municipal liability under Section 1983; however, it must be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* (citation and quotation

marks omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id*. (citation and quotation marks omitted).

"The Supreme Court has strongly suggested that the deliberate indifference standard for municipalities is always an objective inquiry." *Castro*, 833 F.3d at 1076. The "objective standard necessarily applies to municipalities for the practical reason that government entities, unlike individuals, do not themselves have states of mind[.]" *Id*. (citing *Farmer*, 511 U.S. at 841).

For *objective* deliberate indifference on the part of the municipality, there must be "a showing that the facts available to the [defendant] put it on 'actual or constructive notice' that its practices … were 'substantially certain to result in the violation of the constitutional rights of [its] citizens." *Sandoval*, 985 F.3d at 682 (citing *Castro*, 833 F.3d at 1075).

The policy must actually cause the alleged deliberate indifference to the plaintiff's medical needs. *See City of Canton*, 489 U.S. at 391. There must be a "direct causal link" between the policy or custom and the plaintiff's injuries. *Sandoval*, 985 F.3d at 681 (citation omitted).

### 3. There Was No Deliberate Indifference in Plaintiff's Medical Care

Preliminarily, Plaintiff's claim that he was provided inadequate medical care at CCDC in connection with his right rises, *at most*, to the level of negligence. For the year after his original right knee replacement, when he was out of custody, he experienced pain and swelling in the right knee. However, this was usually associated with a fall or bumping his knee into something. The x-rays one year out from his surgery showed no diagnostic or specific signs of infection. The x-rays taken at the Henderson emergency department the day before he was arrested showed no diagnostic of specific signs of infection in the right knee and he was released to go to work.

1  Through the time he was incarcerated in late February 2017 through early 2018, he complained

2  of pain and swelling in the right knee. He reported early on that he had been seen at the

3  Henderson emergency room, but that the workup was *negative* for infection or blood clot.

4      In response to his complaints of pain or swelling he received treatment, including,

5  evaluation, an ACE wrap, various anti-inflammatories and muscle relaxers (ibuprofen, Tylenol,

6  Naprosyn, Robaxin). X-rays were taken early on, in March 2017, which again showed no

7  specific signs of infection. Plaintiff then received work clearance to work in the jail. In

8  December 2017, when he complained that the swelling seemed to be getting worse, repeat x-rays

9  were ordered. He was also given a lower bunk and tier assignment, a right knee elastic brace, an

10  extra blanket to help elevate the knee, and Naprosyn for pain. It was noted he had no problem

11  doing his work. The December 2017 x-ray also showed no specific signs of infection. At the end

12  of January 2018, when he reported that his swelling and pain had worsened, he was referred to

13  an orthopedist. Then, on February 8, 2018, when he complained his knee was excessively

14  swollen, and he presented with "classic" signs of infection, he was immediately transferred to the

15  UMC emergency department.

16      In *Sandoval*, the court noted that was "not a case where a nurse mistakenly misdiagnosed

17  a patient after reasonably attempting to ascertain the cause of unexplained symptoms." *Sandoval,*

18  985 F.3d at 680. Instead, the nurse there made no effort to determine why the inmate was

19  suffering the symptoms or attempt to treat them. Here, by way of contrast, the NaphCare

20  providers did attempt to ascertain the cause of Plaintiff's symptoms when several rounds of

21  imaging were ordered of the right knee and they provided him with a compression wrap, ice, a

22  mechanism to elevate his knee as well as various medications. Plaintiff argues that an MRI

23  should have been ordered, but the failure to do so was not objectively unreasonable where

Plaintiff had displayed no "classic" signs of infection and there were no diagnostic or specific signs of infection in his x-rays.

Plaintiff mentions that he reported a fever on December 27, 2017, but he had requested a "cold packet," and said his symptoms included coughing. He was issued the requested "cold packet." The failure to an MRI of the right knee at that time was not objectively unreasonable given Plaintiff was complaining of cold symptoms and did not mention his right knee.

**4. There is No Evidence of a Policy or Custom that Caused the Alleged Constitutional Violation**

Next, and importantly, even if the healthcare providers' conduct could be characterized as "reckless disregard," Plaintiff has not established deliberate indifference on the part of NaphCare under *Monell*.

Plaintiff's complaint alleges that NaphCare implemented a policy/custom of facilitating substandard care. (ECF No. 4 at 3.) The evidence, however, reflects that Plaintiff received attentive care. In any event, he has not come forward with evidence that NaphCare had a custom or policy of providing inmates at CCDC with substandard care; that any alleged policy amounted to deliberate indifference to Plaintiff's constitutional right; or that any such policy was the moving force behind the alleged constitutional violation.

For these reasons, NaphCare's motion for summary judgment should be granted.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **DISMISSING WITHOUT PREJUDICE** the Doe Medical Staff defendants; and

(2) **GRANTING** NaphCare's motion for summary judgment (ECF No. 75), and entering judgment in NaphCare's favor.

21

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: September 12, 2023

Craig S. Denney
United States Magistrate Judge